1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   PATRICK ANDREW PIERCE,

11              Petitioner,                No. 2:06-cv-01622-NRS

12        vs.

13   DARREL ADAMS, Warden,                 <u>ORDER</u>

14              Respondent.

15

16                          **INTRODUCTION**

17         In his amended petition for writ of habeas corpus, Pierce raises four claims.

18   For the reasons discussed below, petitioner's claims are DENIED IN PART,

19   GRANTED IN PART, and the case is REMANDED to the state trial court for

20   resentencing.

21                          **STATEMENT**

22         The following recitation of the factual background of this case is based on

23   the decision of the Court of Appeals of California rejecting petitioner's direct

24   appeal, *People v. Pierce*, No. C044205, 2005 WL 1230783 (Cal. Ct. App. May 23,

25   2005).  The state court's factual determinations are presumed to be correct

26   pursuant to 28 U.S.C 2254(e)(1).

                                    1

## A. Overview

The victim in this case was born in November 1983.  Her mother, Amy, met defendant, they cohabited for about a year and a half and they married in 1987.  Defendant and Amy had a daughter in 1988 (Amanda) and another in 1989 (Molly).  Defendant was in the Air Force and the family lived in Florida until he was transferred to Aviano Air Force Base in Italy in 1990, where the family lived in a hotel and then in a house.  In January 1993, he was transferred to McClellan Air Force Base and the family lived on base.  Later that year, defendant resigned and the family moved to Illinois.  They first lived with defendant's relatives, but conditions were crowded and early in 1994 they moved to a house of their own.  In the summer of 1994 the family moved to Orangevale, and defendant worked at McClellan as a civilian.  When the base was scheduled to close in 1999, defendant found a job at a base in North Carolina and the family moved.  It was there that the abuse came to light.

## B. Uncharged Acts Against the Victim

In Italy (1990-1993), the victim sometimes would wake up and see defendant standing near her bed, sometimes without pants on, sometimes touching his penis.  When the family moved to McClellan Air Force Base in 1993, when the victim was nine, defendant would go into her room and touch her breasts and genitals, and have her stroke his penis and suck on it.  She "would cry but ... never told him no" because she "was always scared of what would happen."  He would force her head to his penis with his hand.  Defendant "always told me that I can't ever tell anybody."  When the family lived in Illinois (1993-1994), when the victim was 10, similar abuse took place.  Although the house was crowded, defendant would wake her up at night and tell her to go into the bathroom with him.  Once, in Illinois, defendant tried to have intercourse with her, but when he tried to push his penis in she cried and told him it hurt and he stopped; however, the victim later found blood in her underwear and told her mother that she had started menstruating.  Amy testified that the next day the victim told her she was not menstruating.  Amy testified that once, defendant closed their bedroom door and went into the victim's room; she followed and found him crouched in his underwear next to the victim's bed.  He claimed he was just "checking" the kids and although Amy was suspicious, she did not want to make an accusation against him.

## C. Count 1; Continuous Sexual Abuse (§ 288.5)

When the family moved back to the Sacramento area in 1994 when the victim was 10, she had her own bedroom and her half-sisters shared a bedroom.  Until she turned 12 in 1995, defendant again fondled her and licked her vagina, and had her suck his penis; he

again tried to have intercourse with her.  Sometimes he had sexual contact with her a couple times in a week, other times less than monthly.  "He would tell me exactly what he wanted me to do, but as I got older, he would get mad at me if I didn't just do it on my own." He would force her head down so she would suck his penis; sometimes she would cry.  More than once he told her he would hurt her or her mother if she told anybody, and he was both vocally forceful when he said it and sometimes physically forceful in that "[h]e would squeeze the back of my neck" with his hand when he threatened her.  "[I]f I ever didn't do something right away, or I was hesitant about it, he would get mad" and "use a strong voice and tell me I better do it" which made her scared.  She believed the threats because he slapped the children when they did things wrong.  On redirect examination she testified that when she was younger and got in trouble for ordinary things, he would take her in her room and spank her "[b]ut then it would turn into a sexual act right after that." "When I was older, I didn't get the spankings, because I was older. But I did get hit on my head or on my butt if I was crying too loud, or if I didn't do what he told me to do right away."  The neck-grabbing happened during and after sexual contact.

### D. Counts 2-6; Forcible Lewd Acts (§ 288, subd. (b))

Between November 1995 and November 1997, when she was 12 to 13, the victim sucked defendant's penis monthly.  He made her shave her pubic hair a few times, and when he licked her vagina and she had orgasms he would say she liked it, which made her cry.  He sometimes rubbed his penis between her breasts and ejaculated onto her.  He made her watch pornographic videos and act out what was depicted, such as sucking his penis.  He tried to have intercourse with her a few times and told her she was acting like a baby and might be a lesbian when she did not want intercourse or cried from the pain when he tried to enter her; in her view, "I felt like his penis was too big to go into my vagina."  During this time he continued to threaten to hurt the victim or hurt her mother if the victim told anyone about the abuse.

### E. Counts 7-12; Forced Oral Copulation (§ 288a, subd. (b))

After the victim turned 14, the same abuse took place. Defendant again would grab her neck and threaten her.  When she cried during sexual acts he would slap her on the bottom or face and tell her to shut up.  He rewarded her with driving lessons if she sucked his penis while he drove.  She sucked his penis at least 10 times and he licked her vagina at least 10 times during this period.

### F. Counts 13-18; Forcible Lewd Act (§ 288, subd. (c)(1))

Also, after she turned 14, defendant fondled the victim's breasts over 10 times, touched her vagina and tried to have intercourse with her more than once, but he was never able to fully vaginally penetrate her. Sometimes if she did not suck his penis the way he wanted her to he would threaten to "put his penis inside of me [i.e ., her vagina] whether I wanted it or not."

## G. Gaining Access to the Victim

Defendant was sometimes able to do these things by making the other girls stay in their room for long periods for minor infractions, or making them take long baths together. Sometimes when Amanda would ask if she could leave her room to go to the bathroom, defendant would sternly tell her to stay where she was, and his voice came from the victim's room. Amanda sometimes heard the victim crying during punishment; once the victim told Amanda that he was helping her with homework. Defendant said the same thing, but he never helped the other girls with their homework. Once, Amanda came in to the victim's room and found her on the floor, crying, with defendant standing over her, wearing only shorts. Molly, too, sometimes saw defendant near or coming out of the victim's room during punishment periods. The other girls had learned to obey defendant. Amanda sometimes saw defendant hit her mother, Amy, across the face. Amy testified she disagreed with defendant's discipline methods: "I didn't like them to be slapped in the face" and "I didn't like him to get in their face and scream loudly at them." Amanda and Molly complained to their mother about the long punishments defendant imposed.

## H. Discovery of the Abuse

On the trip to North Carolina the family stayed at some hotels; once on the way, and once in a North Carolina hotel, defendant had the victim suck his penis while Amy showered and the other girls slept. About a month after the family moved into a house in North Carolina, on September 26, 1999, Amy found the victim was upset because she had wanted to talk to a friend of hers named Richard, but defendant was making fun of his name, calling him "Dick" and saying "the victim likes Dick"; although Amy told defendant that was inappropriate, he just laughed. Amy then took a shower. Defendant began to feel the victim's breasts. Amy left the shower when she heard the victim crying and saying "stop"; she came out of the shower and saw defendant's "hands come out of the front of [the victim's] t-shirt as soon as I opened the door." The victim then told her mother that defendant had been "molesting" or "abusing" her either "since I was six" or "for as long as I can remember." Defendant had gone downstairs; after he called up to Amy from downstairs and said that he was not armed and would not hurt her, Amy went partway downstairs and told him to leave. Meanwhile, the victim had dialed

4

911.  At about that moment, defendant told Amy the only reason he married her was because of the victim.  The police then arrived and subsequently drove defendant to a motel.  Defendant called Amy that night and said the victim was lying; rather than denying he had abused or harmed the girl, he denied intercourse in a vulgar and callous way, telling the victim's mother "I never f---ed that kid."  A few days later, the rest of the family packed up and moved to San Antonio, Texas.  There, the victim went to a children's advocacy center and prepared a written statement outlining the abuse she had suffered, though she did not "go into extensive detail" in that statement.  She prepared a statement for Texas authorities which also did not go into detail.

## I. Inculpatory Statements by Defendant

In December 1999, defendant spoke with Cumberland County, North Carolina Detective Frank Pierce (no relation) and admitted reading the victim's diary.  During the conversation he related an incident when he had left a "Dear John" letter and left the house; he told Amy "the only reason I got back with you and the only reason I married you was because of that child."  He was arrested about a month later, in January 2000, in North Carolina.  While defendant was awaiting trial, Pierce re-arrested him on a California warrant in December 2000.  While being transported, defendant told Pierce:  "I know what I should have done.  The [B]ible says if you penetrate her and she doesn't bleed, then you kill her."  Defendant testified this garbled what he said, which was a reference to a specific biblical passage (Deuteronomy 22:13-21) prescribing stoning of a bride who is found not to have been a virgin, by the failure to produce a bloodstained cloth, and he was referring to the medical evidence from San Antonio, to the effect that the victim's hymen was intact.

## J. Internet Pornography

Amy later discovered that during their marriage defendant had accessed several pornographic websites on their home computer which, by their titles, offered pictures of young women or women without pubic hair.  Amanda testified that she once saw her father looking at pornographic images of teenage girls on the family computer.

## K. Medical Evidence

Cathy Boyle, a nurse with expertise in child sexual abuse, reviewed records from a nurse and doctor in Texas; the doctor had found the victim's hymen "normal," but the nurse whose work was reviewed had found it "obliterated."  Nurse Boyle disagreed with both the doctor and the other nurse, and opined the hymen was neither "obliterated" nor normal.

## L. North Carolina Trial

The victim testified in this California case that she had testified against defendant in North Carolina.  He was convicted there of two counts based on the T-shirt incident, viz., felonious child abuse and taking indecent liberties with a child.  The parties stipulated that the North Carolina jury convicted him of counts taking place on September 26, 1999, but acquitted him of three counts arising on or about August 27, 1999, i.e., the alleged fellatio in the hotel on the trip to North Carolina.  The stipulation seems to conflict with the opinion affirming the North Carolina convictions, *State v. Pierce* (2002) 153 N.C.App. 525 [570 S.E.2d 152], but this is not important for purposes of this appeal.  The victim was allowed to testify about the reaction of some of the North Carolina jurors after their verdicts were read, but the court in this case instructed the jury to consider that evidence for and only for its effect on the victim:  The North Carolina jurors hugged and kissed her and told her they believed her but had to acquit due to "confusion during the testimony" regarding the fellatio charge.

## M. Defense

Defendant denied any sexual abuse of the victim.  He admitted having pornographic videos (which both he and Amy testified she bought to "spice up" marital congress) but testified that any "teen" pornography websites were accessed inadvertently when he was searching for a contest entry form for the victim offered by a "teen" magazine, or when he followed an offer of a picture-of-the-day to whatever site sponsored that picture.  Defense counsel emphasized that during the period of the alleged abuse the victim visited her father for long periods, saw a youth pastor for religious counseling, and had other logical opportunities to speak up, but did not say anything.  Defense counsel also emphasized the riskiness of some the behavior attributed to defendant, implying he would not have had sexual contact with the victim where discovery was so likely.  Defense counsel also pressed inconsistencies in different versions of the victim's story or newly-revealed details.  He also attempted to show defendant had such an unusual penis shape that the victim should have mentioned it, but the photograph of defendant's penis which was introduced into evidence was not taken when it was fully erect, therefore it did not establish the shape of his erect member.  The victim testified, "I thought that it was big, and I remember that it was always either shaven or neatly cut, the pubic hair was."  She testified she tried not to look at it when she could avoid it, but that when erect "[i]t was mostly at a diagonal position, kind of pointing up."  Contrary to appellate counsel's implication, there was no evidence the victim was familiar with normal penis shapes or sizes.  Defendant's brother John (with whom the family had lived in Illinois) testified the victim was a dishonest person, John's wife Kari testified the victim was manipulative, and their daughter Ashley testified the victim was

6

manipulative and dishonest.  Defense counsel tried to paint Amy as a liar, based on alleged false statements about residency made in her divorce papers, although she testified she filled out the papers according to her attorney's instructions.  He implied Amy used the victim's allegation as a convenient way for her to get out of a bad marriage, caused by defendant's heavy drinking, alleged infidelity, constant fighting, possession of guns, and the fact he once pushed her head into a wall and threatened to throw her through a glass door.  Defendant admitted he had been convicted of two felonies committed against the victim, "felonious child abuse by sexual assault" and "indecent liberties with a child."

At this point we observe that the jury convicted defendant of all 18 counts as charged.  Appellate counsel repeatedly paints this as a "close" case, but the victim's testimony was corroborated in several important ways.  Amy testified she once found defendant crouching over the victim's bed in a suspicious way, and once found blood in the victim's underwear although she was not yet menstruating.  Amy saw defendant with his hands coming out of the victim's T-shirt in North Carolina.  The combined testimony of Amanda and Molly showed that defendant did keep them in their room or in the bath for long periods of time, during which defendant was in or near the victim's room, sometimes with the victim crying.  Defendant accessed pornography geared toward those who wish to see younger women, or women with shaved pubic regions, which tends to show defendant lusted after young females generally and corroborates the victim's story that defendant shaved her pubic region. Defendant's denials of lewd conduct or intention were undermined by his felony convictions for sexually abusing the same victim.  Further, he made bizarre statements to Amy (that the victim "likes Dick" and later, "I never f---ed that kid") and to Detective Pierce (the paraphrase about killing unchaste brides). This case involved positive direct testimony by the victim corroborated by circumstantial evidence provided by several witnesses.  Further, there was no persuasive explanation why the victim and other incriminating witnesses would lie.  Therefore, this was not a close case.

*Pierce*, 2005 WL 1230783, at *1–5.

## PROCEDURAL HISTORY

On May 6, 2003, the jury found Pierce guilty on all 18 counts, including: continuous sexual misconduct with a child under the age of 14; lewd and lascivious acts with a child under the age of 14; forcible oral copulation; lewd and lascivious acts with a 14 to 15-year-old child who was at least 10 years younger than Pierce. The trial court sentenced Pierce to imprisonment for the term of 110 years and 4

months, on June 3, 2003.  The appellate court affirmed the judgment on May 23,
2005.  The California Supreme Court denied Pierce's petition for review, without
opinion, on July 20, 2005.

Pierce filed his petition, in this court, for writ of habeas corpus on July 11,
2006.  Pierce filed an amended federal petition—adding a claim for ineffective
assistance of counsel at both the state trial and appellate level—on January 11,
2007.  On March 9, 2007, Pierce filed a state habeas corpus petition with the
California Supreme Court in order to exhaust his claim of ineffective assistance of
counsel.  That petition was denied by the California Supreme Court on August 15,
2007.

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a
person in custody pursuant to the judgment of a State court only on the ground that
he is in custody in violation of the Constitution or laws or treaties of the United
States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must
apply with respect to a state prisoner's claim that was adjudicated on the merits in
state court.  *Williams v. Taylor*, 529 U.S. 362, 402–13 (2000).  Under the AEDPA,
an application for habeas corpus will not be granted unless the adjudication of the
claim "resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States;" or "resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence presented in the
State Court proceeding." 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 71
(2003) (disapproving of the Ninth Circuit's approach in *Van Tran v. Lindsey*, 212
F.3d 1143 (9th Cir. 2000));  *Williams*, 529 U.S. at 412.  "[A] federal habeas court

1   may not issue the writ simply because that court concludes in its independent

2   judgment that the relevant state-court decision applied clearly established federal

3   law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75–76 (quoting *Williams*,

4   529 U.S. at 411).  "Rather, that application must be objectively unreasonable." *Id.*

5       While habeas corpus relief is an important instrument to assure that

6   individuals are constitutionally protected, *Barefoot v. Estelle*, 463 U.S. 880, 887

7   (1983);  *Harris v. Nelson*, 394 U.S. 286, 290 (1969), direct review of a criminal

8   conviction is the primary method for a petitioner to challenge that conviction.

9   *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).  In addition, the state court's

10  factual determinations must be presumed correct, and the federal court must accept

11  all factual findings made by the state court unless the petitioner can rebut "the

12  presumption of correctness by clear and convincing evidence."  28 U.S.C.

13  § 2254(e)(1); *Purkett v. Elem*, 514 U.S. 765 (1995); *Thompson v. Keohane*, 516

14  U.S. 99 (1995); *Langford v. Day*, 110 F.3d 1380, 1388 (9th Cir. 1997).  Finally,

15  even if this court finds a constitutional violation, such a violation does not warrant

16  habeas relief unless the violation in question "had substantial and injurious effect

17  or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting

18  *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

19      Moreover, Rule 4 of the Rules Governing § 2254 Cases requires the Court to

20  make a preliminary review of each petition for writ of habeas corpus.  The Court

21  must dismiss a petition "[i]f it plainly appears from the face of the petition . . . that

22  the petitioner is not entitled to relief."  Habeas Corpus Rule 4; *see also Hendricks

23  v. Vasquez*, 908 F.2d 490 (9th Cir.1990).

## DISCUSSION

25      Petitioner seeks habeas relief on four grounds: (1) the trial court erroneously

26  admitted improper evidence that jurors, in a prior trial involving the same victim,

9

1  believed the victim's testimony; (2) petitioner was deprived of effective assistance

2  of trial counsel and appellate counsel; (3) the trial court erroneously admitted

3  evidence that petitioner's stepfather sexually abused petitioner's sister; and (4) the

4  trial court erred at sentencing when it increased petitioner's sentence based upon

5  facts which were neither found by the jury beyond a reasonable doubt or admitted

6  by the petitioner.

7  ## 1.  Juror Statements from the Previous Trial

8        Claim 1 arises out of the trial court's admission of testimony from the victim

9  that, at the conclusion of the North Carolina trial, some of the jurors hugged and

10 kissed her and "told her they believed her but had to acquit due to 'confusion

11 during the testimony' regarding the fellatio charge."  *Pierce*, 2005 WL 1230783,

12 at *4.  Petitioner argues that the admission of this testimony entitles him to habeas

13 relief on the grounds that:  (a) by admitting the statements of the North Carolina

14 jurors, whom he was unable to cross-examine, the court deprived him of his right

15 under the Confrontation Clause of the Sixth Amendment; and (b) the statements, as

16 admitted, constituted impermissible vouching evidence violating his right to Due

17 Process under the Fourteenth Amendment.

18       *a.  Pierce Was Not Deprived of His Rights Under the Confrontation Clause*

19       Pierce is not entitled to federal habeas relief because he is unable to

20 demonstrate that the California courts violated clearly established federal law as

21 determined by the Supreme Court.  In fact, Supreme Court precedent supports a

22 finding that Pierce's Confrontation Clause rights were not violated.

23       The admission of the out-of-court statements of the North Carolina jurors

24 did not violate Pierce's rights under the Confrontation Clause, because those

25 statements were not offered for the truth of the matter asserted.  The Confrontation

26 Clause applies to those who "bear testimony" against the accused.  *Crawford v.*

*Washington*, 541 U.S. 36, 51  (2004).  Typically, "testimony" is a statement "made for the purpose of establishing or proving some fact." *Id*. (internal quotation omitted).  In *Crawford*, the Supreme Court explicitly stated that the Confrontation Clause does not bar statements offered "for purposes other than establishing the truth of the matter asserted." *Id*. at 59 n.9.  Here, the jury was instructed by the judge that the victim's testimony, regarding the comments made to her by the North Carolina jurors, was to be considered only for the effect on the victim, but not for the truth of what was actually being said.  Therefore, Pierce is not entitled to habeas relief on this ground.

> *b.  The Admitted Statements Did Not Constitute Impermissible Vouching*

Pierce argues that the admission of the North Carolina juror's statements constituted vouching.  The California Court of Appeals rejected Pierce's contention.  This court agrees.  This court finds no Supreme Court precedent suggesting this circumstance is vouching (and Pierce is unable to direct this court to any clearly established precedent).  Pierce presents cases finding impermissible vouching (1) where *other* witnesses testified as to a person's veracity, or (2) where a prosecutor expressed his or her belief in the credibility of a witness.  However, there is no precedent establishing that impermissible vouching also includes situations in which a witness testifies that other people believed her.  Further, this evidence was not offered for the truth of the matter asserted—that the North Carolina jurors actually believed the victim—but was offered to show its effect upon the victim.

Because this court finds that no constitutional violation occurred here, it need not address Pierce's arguments that the testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quotation marks and citation omitted).

1    Therefore, Pierce is not entitled to habeas relief on this ground.

2              **2.  Assistance of Trial and Appellate Counsel**

3         Pierce next contends that he was deprived of his right to effective assistance

4    of counsel, under the Sixth and Fourteenth Amendment, (1) when his trial counsel

5    failed to object to the admission of the above statements made by the North

6    Carolina jurors, based on California Evidence Code section 1150, and (2) when his

7    appellate counsel failed to raise ineffective assistance of trial counsel at his appeal.

8    The State argues that (a) Pierce is time-barred from raising the ineffective

9    assistance of counsel claim as this ground for relief was raised after the one-year

10   statute of limitation had expired, and the new claim does not relate back to his

11   original petition; and (b) even if Pierce were not time barred, he cannot

12   demonstrate that there was ineffective assistance entitling him to habeas relief.

13        *a.  Time Bar and Relation Back*

14        Pierce's one-year statute of limitations under the AEDPA expired on

15   October 18, 2006.  Pierce did not add his claim for ineffective assistance to his

16   petition until January 11, 2007.  Thus, unless those claims "relate back" to his

17   original, and timely, filing made on July 11, 2006, they are barred from

18   consideration by this court.  *Mayle v. Felix*, 545 U.S. 644, 649–650, 654 (2005); 28

19   U.S.C. § 2244(d)(1); Habeas Corpus Rule 11; Fed. R. Civ. P. 15(c)(1).

20        "Amendments made after the statute of limitations has run relate back to the

21   date of the original pleading if the original and amended pleadings 'ar [i]se out of

22   the conduct, transaction, or occurrence.'" *Mayle*, 545 U.S. at 655 (quoting Fed. R.

23   Civ. P. 15(c)(2)).  A habeas petition must "specify all the grounds for relief

24   available to the petitioner" and "state the facts supporting each ground."  Habeas

25   Corpus Rule 2(c).  A habeas petitioner is aware of this requirement, because the

26   model form available to aid prisoners as guidance in filing their habeas petition

1  states:

2    **CAUTION: You must include in this petition <u>all</u> the grounds for**
     **relief from the conviction or sentence that you challenge. And you**
3    **must state the facts that support each ground. If you fail to set**
     **forth all the grounds in this petition, you may be barred from**
4    **presenting additional grounds at a later date.**

5  Petition for Relief From a Conviction or Sentence By a Person in State Custody,

6  Habeas Corpus Rules, Forms App., 28 U.S.C. § 2254 (emphasis in original).

7         Pierce's claim of ineffective assistance does not relate back to his original

8  petition.  In the timely petition, Pierce only argued that he was entitled to habeas

9  relief because the admitted testimony (1) deprived him of his right under the

10 Confrontation Clause and (2) constituted impermissible vouching evidence.

11 In *Mayle*, the court looked both to the grounds for relief and to the facts giving rise

12 to those grounds.  Here, Pierce raises an entirely new ground for relief.  Further,

13 although this ground rests upon some similar facts, the dispositive facts are

14 different.  Under an ineffective assistance of counsel claim, this court looks to the

15 actions of counsel (from an objective perspective) to determine what counsel

16 should have done.  *Strickland v. Washington.* 466 U.S. 668, 687 (1984)

17         b.  *Deficiency of Representation and Prejudice*

18        Even if Pierce's claim were to relate back, this court still finds no grounds to

19 grant him habeas relief on the effective assistance of counsel claim.  Ineffective

20 assistance of counsel claims are governed by the two-prong test articulated in

21 *Strickland*, 466 U.S. at 687.  Under *Strickland*, the Court must determine: "(1)

22 whether the performance of counsel was so deficient that he was not functioning as

23 'counsel' as guaranteed under the Sixth Amendment; and (2) whether this deficient

24 performance prejudiced the defendant by depriving him of a fair trial." *United*

25 *States v. Davis*, 36 F.3d 1424, 1433 (9th Cir. 1994) (citing *Strickland*, 466 U.S. at

26 691–92).  "In determining whether counsel's performance was deficient, [the

1  Court] appl[ies] an objective standard of reasonableness, indulging a strong

2  presumption that a counsel's conduct falls within the wide range of reasonable

3  professional assistance." *Id.* (citing *Strickland*, 466 U.S. at 689).  Under

4  *Strickland*, the Court determines not what defense counsel *could* have pursued, but

5  rather whether counsel's strategy was *reasonable.  Siripongs v. Calderon*, 133 F.3d

6  732, 736 (9th Cir. 1998).

7        On this record, this court is unable to find that the California courts' rulings

8  violated clearly established federal law.  Ineffective assistance of counsel

9  prejudices a petitioner when "there is a reasonable probability that, but for

10 counsel's unprofessional errors, the result of the proceeding would have been

11 different.  A reasonable probability is a probability sufficient to undermine

12 confidence in the outcome." *Strickland*, 466 U.S. at 694.  The petitioner "'need

13 not show that [counsel's] deficient conduct more likely than not altered the

14 outcome in the case.  This 'preponderance' standard was explicitly rejected in

15 *Strickland*.'" *Richter v. Hickman*, 578 F.3d 944, 952 (9th Cir. 2009) (quoting

16 *Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir. 1994) (citing *Strickland*, 466 U.S.

17 at 693) (emphasis omitted)).

18       Pierce claims that, by not challenging the admission of the North Carolina

19 jurors' statements as inadmissible under California Evidence Code section 1150,

20 his trial counsel acted objectively unreasonable.  When the prosecution sought to

21 elicit those statements from the victim, Pierce's counsel objected on relevance,

22 hearsay, and California Evidence Code section 352[1] grounds, all of which were

23

24       [1]This section is similar to Federal Rule of Evidence 403: "The court in its discretion may
   exclude evidence if its probative value is substantially outweighed by the probability that its
25 admission will (a) necessitate undue consumption of time or (b) create substantial danger of
   undue prejudice, of confusing the issues, or of misleading the jury."  Cal. Evid. Code § 352.
26

1    overruled.

2        California Evidence Code section 1150 governs the admission of evidence

3    regarding the validity of a verdict.

> (a) Upon an inquiry as to the validity of a verdict, any otherwise
> admissible evidence may be received as to statements made, or
> conduct, conditions, or events occurring, either within or without the
> jury room, of such a character as is likely to have influenced the
> verdict improperly. No evidence is admissible to show the effect of
> such statement, conduct, condition, or event upon a juror either in
> influencing him to assent to or dissent from the verdict or concerning
> the mental processes by which it was determined.
>
> (b) Nothing in this code affects the law relating to the competence of a
> juror to give evidence to impeach or support a verdict.

10   Cal. Evid. Code § 1150.  Pierce argues that, by admitting the statements and

11   actions of past jurors, the trial court ran afoul of this section, because it revealed

12   the effect the victim's testimony had upon the jurors.

13       Whether or not admitted evidence violates California Evidence Code section

14   1150 depends upon the purpose for which it is offered.  Had those statements been

15   admitted for the purpose of demonstrating that the victim's testimony effected the

16   jurors' decision, this section would be implicated.  However, as discussed above,

17   the trial court made clear that such evidence was to be considered only for its effect

18   on the victim, and not the truth of the matter asserted (that the jurors were

19   convinced by the victim's testimony).  Therefore, the evidence was not offered "to

20   show the effect of such statement . . . upon a juror" and did not violate California

21   Evidence Code section 1150.  Furthermore, even if the admission did violate that

22   code, this court cannot find that such a violation was so clear that counsel acted

23   objectively unreasonable in objecting only on three grounds and not on this fourth

24   one.

25       Having determined that trial counsel was not deficient in the representation

26   of Pierce, this Court also finds that appellate counsel was not deficient by not

15

raising this point on appeal.

Therefore, Pierce is not entitled to habeas relief on this ground.

### 3.  Evidence that Pierce's Stepfather Sexually Abused Pierce's Sister

Claim 3 arises out of the trial court's admission of testimony from the investigating detective that Pierce's stepfather had molested Pierce's sister.  Pierce contends that the unfair prejudice caused by such an admission deprived him of his right to Due Process of law under the Fourteenth Amendment.

A federal court has "no authority to review alleged violations of a state's evidentiary rules in a federal habeas proceeding."  *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998).  Such rulings do not violate due process "unless the evidence is 'of such quality as necessarily prevents a fair trial.'"  *Id*. (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).

The detective's testimony that Pierce's stepfather molested Pierce's sister was given during the government's redirect examination, in response to a line of questioning developed on cross-examination.  On cross-examination, Pierce asked the investigating detective the following question:

"[Q.]:  [Reading from transcript] 'She knows how much I love my kids, and what she has done is trying to make – make my kids hate me.  And then she says – he says she has taken them away from me, and making me look [like] my [] own stepfather.  Well I will tell you, between you and I, I have gone overboard for those kids since day one, and you can ask my wife.'  He [Mr. Pierce] said that as well, didn't he?"

"[A.]:  Yes."

On re-direct examination, counsel for the government then asked:

"[Q.]:  There is a reference to 'she is trying to make me look like my own stepfather.'  You recall that reference?"

16

1  "[A.]: Yes."

2  "[Q.]: Is it true in the sentences just preceding that, Mr. Pierce makes a

3  statement indicating that his stepfather had molested his own sister?"

4  [California Evidence Code section 352 objection overruled.]

5  "[A.]: Yes, he did."

6  The California Court of Appeals found that this testimony did not violate Pierce's

7  due process right because (1) the prosecutor was entitled to clarify the meaning of

8  Pierce's statement to the detective, and (2) the evidence did not prejudice Pierce in

9  any event.  *Pierce*, 2005 WL 1230783, at *7–8.  Pierce has not satisfied his burden

10  of showing that the admission of this evidence was improper, let alone so improper

11  that it *necessarily* prevented a fair trial.  Not being able to show this, Pierce

12  certainly cannot demonstrate that the California courts' decisions that Pierce was

13  not entitled to habeas relief was in violation of clearly established federal law.

14       Therefore, Pierce is not entitled to habeas relief on this ground.

15                          **4.  *Cunningham v. California* Claim**

16       Finally, Pierce claims that the trial court violated his Sixth Amendment right

17  to a jury trial when it imposed upper-term sentences based on facts that were

18  neither found by the jury nor admitted by him.  Both parties agree that the trial

19  court's sentencing violated the Supreme Court's holding in *Cunningham v.*

20  *California*, 549 U.S. 270 (2007).  However, because sentencing occurred after

21  *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S.

22  296 (2004), but before *Cunningham*, the question before this court is whether

23  *Cunningham* should be applied retroactively, under the test set out in *Teague v.*

24  *Lane*, 489 U.S. 288 (1989).

25       "*Cunningham* . . . did not announce a new rule of constitutional law and may

26  be applied retroactively on collateral review."  *Butler v. Curry*, 528 F.3d 624, 639

(9th Cir. 2008).

Therefore, this court must "remand to the state trial court for resentencing under the procedures delineated in [*People v.*] *Sandoval*, [161 P.3d 1146 (Cal. 2007)]." *Chioino v. Kernan*, 581 F.3d 1182, 1186 (9th Cir. 2009).

Accordingly, IT IS HEREBY ORDERED that Petitioner's habeas petition is DENIED IN PART, GRANTED IN PART, and the case is REMANDED to the state trial court for resentencing.

DATED:  **January 5, 2010**

_____

Honorable N. Randy Smith

Ninth Circuit Court of Appeals Judge